BREWSTER v. GOFF et al.

(District Court, M. D. Pennsylvania. September 11, 1908.)

No. 40, February Term, 1908.

1. BANKRUPTCY—VOIDABLE PREFERENCE—KNOWLEDGE OF CREDITOR.

A member of a partnership having a number of building contracts on hand, and claiming to have several thousand dollars due him, but on which he could collect nothing, to satisfy an insistent creditor, conveyed his residence for the benefit of such creditor, stating at the time that it was his only available resource. Both he and the firm were, in fact, insolvent, and became bankrupts within four months. The creditor knew that the firm had recently suffered a considerable loss, and had thereafter been persistent in urging payment, and had shortly before obtained a conveyance of the residence of the other partner. *Held*, that such facts were sufficient to give the creditor reasonable cause to believe that a preference was intended and render the conveyance voidable at suit of the bankrupts' trustee.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, §§ 255–258.]

2. SAME—EFFECT ON THIRD PERSON PARTICIPATING.

A person who participates in a transaction by which a creditor secures a preference must abide the consequences. Where a conveyance of property was made by a bankrupt, under such circumstances as amounted to a voidable preference, to the mother of a creditor, who paid the consideration agreed on, which was applied on the bankrupt's account, such creditor acting in the transaction as the agent of his mother, a bill to set aside the conveyance and directing a reconveyance of the property to the trustee of the bankrupt will be sustained against the mother, the grantee in the deed, as well as against a third person, to whom the property was attempted to be conveyed after proceedings to avoid the transaction had been taken.

In Equity. On final hearing.

Fred B. Davis, William Brewster, G. F. Lazarus, and B. W. Davis, for plaintiff.

D. A. Fell and James R. Scouton, for defendants.

ARCHBALD, District Judge. This case was heard in conjunction with a similar one against the Goff Lumber Company (164 Fed. 124), and the evidence there taken, so far as it applies, it is agreed is to be considered here also. On August 23, 1907, about two weeks after the transaction which is there in controversy, G. H. Moore, the senior member of the firm of G. H. Moore & Son, the present bankrupts, for the recited consideration of $3,100, made a deed of his residence in Forty Fort, Pa., to Harriet M. Goff, the wife of M. F. and the mother of W. S. Goff, comprising the Goff Lumber Company. An option in writing was given by Mrs. Goff at the same time, by which Mr. Moore was to have the right to buy back the property at any time within six months for the same amount; a lease being also executed to him for six months from September 1, at $15.50 a month rent, which was the interest at 6 per cent. on the consideration. This conveyance was

made subject to a mortgage of $1,500 which was on the property, and two judgments amounting to $630, which were liens against it. These having been deducted, a check was given by Mrs. Goff to the Goff Lumber Company for $970, the difference which was credited on the account of G. H. Moore & Son. W. S. Goff admittedly acted for his mother in the transaction, and she is therefore affected with whatever came to his notice in that connection, not only by the express terms of the bankruptcy act (Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), but on general principles; and it is not necessary, therefore, to inquire into the good faith of the purchase by her, which, however, is more than doubtful. Within three months afterwards, on November 18, 1907, G. H. Moore & Son became bankrupt, and filed a voluntary petition in this court, on which, both individually and as a firm, they were duly adjudicated. On December 14th, Mrs. Goff made a deed of the property to W. P. Morgan, the other defendant, a brother-in-law of W. S. Goff, for $3,-200; but the deed was not delivered until December 16th before which, on December 14th a petition was presented to the referee praying for an injunction, preventing Mrs. Goff from conveying or incumbering the property, on which a restraining order was granted and served the same day, before the transaction was consummated; an injunction being ordered by the court subsequently. This is controverted; it being claimed that the deed was delivered the day it bears date. But Mr. Morgan says not, his testimony being specific that December 14th was Saturday, when he was busy, and that, while he gave his check that day to Mrs. Goff, he did not go for the papers until Monday, when he also looked up the liens on the property. He being the party to be affected, his statement is controlling, and, indeed, convincing; and, the conveyance having been made after service of the restraining order, he takes nothing in the face of it. 25 Cyc. 1450. Even if this were not so, he would not be able to maintain the position of a bona' fide purchaser for value. By his own admission he bought without looking at the property on the mere say-so of his brother-in-law, and, although a shrewd business man, dealing in real estate as well as other matters, he actually agreed to pay $100 more for it—$3,-200 being the consideration in his deed—than Moore had the right to buy it back for. It is absurd to argue in the face of this that the conveyance to him was anything more than a makeshift. The courts are not so obtuse that they cannot see through such transparencies.

That the payment secured by the Goff Lumber Company, through the conveyance to Harriet M. Goff was a preference, there can be no question. And Mrs. Goff, through W. S. Goff, being a party to it, must abide by the consequences. Roberts v. Johnson, 18 Am. Bankr. Rep. 132, 151 Fed. 567, 81 C. C. A. 47. The conveyance was brought about in this way. By the last of August, including the bill for the D. B. Moore house, G. H. Moore & Son were owing the Goff Lumber Company some $3,300 or $3,400, or, taking that out, about $2,400, and Boyle, their collector, after the failure of the Society Circus in July, by which Moore & Son lost $5,000, was going on an average

twice a week to get it. Moore told him they could pay nothing, and that the only thing he could do was to sell them his property. Boyle was to see W. S. Goff, which he did, and later Moore himself saw him and he agreed to look at it. Moore told him that this was their only available resource, and that he would sell if he could have an option to redeem it. Goff came and examined the property and said he would try and get a buyer; the price named being $3,100. Goff spoke to his mother and she agreed to take it. Thereupon, at his suggestion, he and Moore met at Mr. Fell's office, and the deed was made out to Mrs. Goff, six months being given to Moore to redeem it, and 6 per cent. on the price being fixed as the rental. Goff says that Moore wanted to sell in order to get money to buy material; but considering that the Goff Lumber Company, by the arrangement, was to get all over and above the incumbrances, there clearly could have been no such purpose in it. The same day they also secured $900 in cash, which was coming to Moore & Son on the E. J. Moore building. This money was earned, but was not yet payable, and was refused to Moore, but was paid to Goff to apply on the job. Including it, the account of the Goff Lumber Company was paid up to within about $500.

The failure of the Society Circus was undoubtedly the cause of Moore & Son's bankruptcy. This concern was sold out by the sheriff July 31st, but Moore & Son seem still to have had hopes of realizing something out of it through the interpleader proceedings which were pending, which were not disposed of until along in the fall, after which there was little question as to what would be the outcome. The money so tied up and eventually lost, as well as that which was dependent on the finishing up of their building operations, deprived them of ready cash with which to obtain new material as well as pay their men promptly and demand corresponding service, thus hampering them seriously with their various contracts. Upon inquiry by Mr. Fell, at the time of the conveyance to Mrs. Goff, Moore went over his affairs to a certain extent, stating that he had $11,000 or $12,000 outstanding, which he expected to get in, in a little while, and, if he did that, he would be in easy circumstances, the Goff Lumber Company being the only ones who were pressing him. On the strength of this expectation, he also undertook to take care of the two judgments, amounting to $630, which were liens on his property. The architects, as he claimed, were holding him up on some of his jobs, and refusing to honor his orders, or give him certificates for what was due him, but upon going to certain of them, while the parties were still together, Mr. Fell was informed that this was not so, and that certificates were not given because the times for payment had not come. The amount said by Mr. Moore to be due included that which was owing by the Society Circus, which was nearly one-half of it, which inquiry would have disclosed, but nothing was, in fact, said of it. To get the rest of this money also, Moore & Son would have had to pay out for material from $4,000 to $5,000 which they did not have and could not command, and which would have increased their indebtedness to about $15,000. Under the most favorable circumstances, up-

on the completion of the several buildings under way, and getting all that was due them from the Society Circus, they would only have been $2,000 or $3,000 ahead, and without that they would be just about that much behindhand. This was not brought out, however, at the time of the transfer, nothing being asked that would do so; Mr. Goff and Mr. Fell, except so far as inquiry was made of one firm of architects, contenting themselves with the general declaration by Moore as to the amount that was coming to him and the effect that it would have on his affairs. But the best that could be made out of it, the outlook for the firm as so presented was anything but a promising one. As said in the other case, they were evidently in deep water, and, while still a going concern, it was clearly a question how long they would be. The Goffs knew of the failure of the Society Circus, and at least in a general way the fact that Moore & Son were involved in it. They had refused to furnish material for it, as a losing venture, and immediately after it went under their collector came twice a week for his money. As W. F. Goff told the trustee afterwards, it was this that brought about the bankruptcy. By express notice also from Moore, in taking his residence, the Goff Lumber Company were getting his last available asset. A few days before they had secured a deed from D. B. Moore, the son, for his house, and now they were taking over that of his father, in view of which, and the signs of financial distress which were otherwise manifest, they assumed whatever risk there was in doing so. In re Hines (D. C.) 16 Am. Bankr. Rep. 495, 144 Fed. 543; Wright v. William Skinner Mfg. Co. (C. C. A.) 162 Fed. 315. Indeed, the very course taken throughout the whole transaction discloses the doubt which they had with regard to it, Mrs. Goff being put forward as the purchaser at first, and the title being shifted over to Mr. Morgan so as to have it if possible at a still further remove, when a contest with creditors over it was imminent. Mrs. Goff professes to have bought for investment, but she was very quick to dispose of the property when her son thought it advisable to do so. The only possible saving thing which the defendants have to rely on is that Moore said there was considerable money coming to him within a few days, and that, if he got it, he would be in easy circumstances. But the "if" was a large one, and the inquiry made by Mr. Fell of the architects showed that the statement could not be relied upon, dispelling the assurance which otherwise might be made out of it.

It is not to be denied that, as a matter of business, a creditor has the right to take all that he can get, and collect up as closely as he is able. No one, indeed, could get along without that. But that is not to say that, if the debtor at the time is manifestly in failing circumstances and does not hold out against bankrupcty for the requisite period, the creditor may not be compelled to surrender the preference which he has secured and come in pro rata with others not so favored. In the present instance, after all has been said, the case therefore comes down to this. A contractor, with half a dozen building operations on hand, and claiming to have a good many thousand dollars due him,

but of which he cannot get a penny, his orders for money being turned down, and certificates from the supervising architects being refused him, as a last expedient, to satisfy an importunate creditor, deeds over his residence to secure a quieting credit. This so clearly shows on its face that he is not only in straits, but in extremities, as to warn the creditor so preferred that whatever is secured is secured conditionally, and that, if bankruptcy intervenes within four months, the advantage cannot be retained.

Let a decree be drawn sustaining the bill, declaring that the transaction complained of was a voidable preference, and directing a reconveyance of the property to the trustee, with costs.